## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KENNETH JERMAINE ELLIS,          )
                                 )
                Petitioner,      )
                                 )
          v.                     )          1:24CV371
                                 )
R. VAN GORDER,                   )
                                 )
                Respondent.      )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket Entry 1.) Respondent has moved for summary judgment (Docket Entry 5; see also Docket Entry 6 (Supporting Brief)) and Petitioner has filed a response in opposition (Docket Entry 9). For the reasons that follow, the Court should grant Respondent's Motion for Summary Judgment.

## I. Procedural History

On March 6, 2019, in the Superior Court of Davidson County, a jury found Petitioner guilty of possession of marijuana up to 1/2 ounce and possession of marijuana paraphernalia in case 16CRS50958, fleeing to elude arrest by motor vehicle with at least three aggravating factors in case 16CRS50960, and possession of a firearm by a convicted felon in case 16CRS1704. (See Docket Entry 1, ¶¶ 1,

2, 4, 5; <u>see also</u> Docket Entry 6-7 at 2-4.)[1] Following those guilty verdicts, Petitioner pled guilty to habitual felon status in case 17CRS1950. (<u>See</u> Docket Entry 1, ¶ 6; <u>see also</u> Docket Entry 6-7 at 5-8.) The trial court then sentenced Petitioner as a habitual felon on the firearm offense to 130 to 168 months' imprisonment, consolidated the remaining offenses, and sentenced Petitioner as a habitual felon on that consolidated set of offenses to a consecutive sentence of 120 to 156 months' imprisonment. (<u>See</u> Docket Entry 1, ¶ 3; <u>see also</u> Docket Entry 6-8.) Petitioner thereafter appealed his convictions (<u>see</u> Docket Entry 1, ¶ 8), and the North Carolina Court of Appeals ruled that "[t]he trial court did not err in allowing Rule 404(b) evidence of [Petitioner]'s 10 February 2011 fleeing a police stop," "[t]he trial court did not abuse its discretion under Rule 403 in admitting the testimony regarding [Petitioner]'s 10 February 2011 fleeing a police stop," and "[Petitioner]'s challenges to the motion to suppress and the constitutionality of N.C.G.S. § 20-16.3A are not preserved for appeal and are dismissed," <u>State v. Ellis</u>, No. COA19-820, 274 N.C. App. 157, 848 S.E.2d 756, 2020 WL 6140639, at *6 (Oct. 20, 2020) (unpublished). Petitioner did not seek further review in the North Carolina Supreme Court. (<u>See</u> Docket Entry 1, ¶ 9(g).)

---

[1] Page citations refer to the page numbers that appear in the footer appended to documents upon their docketing in the CM/ECF system.

Petitioner next submitted a pro se motion for appropriate relief ("MAR") to the trial court (see Docket Entry 1, ¶ 11(a); see also id. at 72-241), and the trial court twice appointed counsel for Petitioner (see Docket Entry 6-13; see also Docket Entry 6-19 at 7) but, ultimately, granted each of those attorneys' motions to withdraw (see Docket Entry 6-19 at 7; see also Docket Entry 6-21). During the time when Petitioner remained represented by his second appointed counsel, he submitted a pro se "Amendment to [MAR]" (Docket Entry 6-27 at 29-36), in which he added arguments and authorities to existing arguments in his MAR (see id. at 29-30, 32) as well as replaced "Argument 7(C)" of his MAR with a new argument (id. at 30 (original MAR and Amendment to MAR collectively referred to as "Amended MAR")). Thereafter, the trial court entered an order denying claims two through six and claim eight of Petitioner's Amended MAR and ordering an answer from the state on claims one and seven. (See Docket Entry 6-22.) Following the state's submission of an answer on claims one and seven (see Docket Entry 6-23), the trial court entered another order denying claim one of Petitioner's Amended MAR, and ordering Petitioner to file a reply brief regarding claim seven (see Docket Entry 6-24). Petitioner, through a third attorney, filed a reply brief (see Docket Entry 6-25), and the trial court subsequently entered an order denying claim seven of Petitioner's Amended MAR (see Docket Entry 6-26). Petitioner then sought review of the trial court's

3

denial of his Amended MAR via a petition for a writ of certiorari in the North Carolina Court of Appeals (see Docket Entry 6-27), which that court summarily denied (see Docket Entry 6-28).

Petitioner thereafter submitted the instant Petition (Docket Entry 1), Respondent moved for summary judgment (Docket Entry 5; see also Docket Entry 6 (Brief in Support)), and Petitioner responded in opposition (Docket Entry 9). For the reasons that follow, the Court should grant Respondent's Motion for Summary Judgment.

## II. **Facts**

On direct appeal, the North Carolina Court of Appeals summarized the trial evidence as follows:

> On 19 and 20 February 2016, the Lexington Police Department established a traffic checkpoint at West 5th Avenue and Murphy Drive near Business Highway 85/29-70. According to the Lexington Police Department form authorizing the checkpoint, the "[d]irections for [the checkpoint were to c]heck the [drivers] of the vehicles entering the [checkpoint] from all directions for motor vehicle violations. Justification[:] Compliance with motor vehicle laws." Officer Ronnie Best ("Best") signed the form authorizing the checkpoint and corroborated the purpose of the checkpoint. Officers conducted the checkpoint according to the Lexington Police Department's Checkpoint Policy and Procedure Manual, which required the checkpoint authorization form. The checkpoint authorization form also included "Briefing Time[:] 11:00 P.M. . . . Starting Date/Time[:] 11:23 P.M. . . . Ending Date/Time[:] 01:25 A.M. . . . [and] Primary Location[:] W. 5th Avenue/Murphy Drive." Best testified the times on the checkpoint authorization form were correct and testified he "ha[d] the blue lights running [on his police car] the entire time" the checkpoint was being conducted. The checkpoint location was chosen due to numerous cars speeding on that road, which was "a highly traveled area." According to Best, traffic continued

4

approaching the checkpoint at 1:25 a.m. on 20 February 2016, causing him to extend the duration of the checkpoint, and multiple vehicles were stopped when Best saw [Petitioner] approach the checkpoint.

[Petitioner] approached the checkpoint at approximately 1:39 a.m. After giving Best his driver's license, [Petitioner] refused to place his car in park when officers instructed him to do so and fled the scene. During the chase, [Petitioner] swerved into the oncoming lane, then back into the right lane. Officers pursued [Petitioner], stopped his vehicle, and arrested him. When officers searched the vehicle, they found marijuana, and an officer retracing the path of pursuit discovered a Glock 21 handgun, clip, and holster in the area where [Petitioner] had swerved into the oncoming lane.

. . .

Before trial, on 15 May 2018, [Petitioner] moved to suppress evidence resulting from the checkpoint and the corresponding search. Specifically, the motion requested suppression of: (1) evidence from the search of [Petitioner]'s person, vehicle, and route traveled; (2) [Petitioner]'s statements made after he was detained; and (3) "any and all evidence seized in his case on [20 February 2016]." After conducting an evidentiary hearing on 20 July 2018, the trial court denied the motion to suppress on 26 July 2018.

Immediately prior to the 4-5 March 2019 trial, [Petitioner] argued no DNA evidence linked him to the handgun and made a pretrial motion to dismiss the charge of possession of firearm by a felon, which the trial court denied. However, [Petitioner] did not object at trial to the denial of his motion to suppress or object to the admission of the evidence referenced in the motion to suppress.

Ellis, 2020 WL 6140639, at *1-2.

5

## III. <u>Petitioner's Grounds for Relief</u>

The Petition identifies nine grounds for relief:

1) "[t]he State did not afford Petitioner an opportunity to litigate his Fourth Amendment violation fully and fairly" (Docket Entry 1, ¶ 12(Ground One) (standard capitalization applied));

2) "[t]he trial court erred in determining that the checkpoint was appropriately tailored for determining compliance with motor vehicle laws" (<u>id.</u>, ¶ 12(Ground Two) (standard capitalization applied));

3) "Section 20-16.3A of the North Carolina General Statutes is invalid as it violates the fundamental right to travel, protected by the Privileges or Immunities Clause" (<u>id.</u>, ¶ 12(Ground Three) (standard capitalization applied));

4) "Section 20-16.3A of the North Carolina General Statutes is invalid as it violates the Equal Protection Clause" (<u>id.</u>, ¶ 12(Ground Four) (standard capitalization applied));

5) "[t]he trial court erred in denying [Petitioner]'s motion to suppress based on the unconstitutionality of Section 20-16.3A" (<u>id.</u> at 20 (standard capitalization applied);

6) "[t]he trial court erred by denying [Petitioner]'s motion to dismiss the charge of possession of a firearm by a felon which violated his U.S. constitutional rights under the 4th, 5th, 6th, and 14th Amendments and North Carolina constitutional rights under

6

Article 1, Sections 18, 19, 20, 22, 23, 24, and 26" (id. at 22 (standard capitalization applied));

7) "[t]he State violated Petitioner's U.S. constitutional rights under the 4th, 5th, 6th, and 14th Amendments and North Carolina constitutional rights under Article 1, Sections 18, 19, 20, 2, 23, 24 and 26 by using erroneous video footage as evidence" (id. at 24);

8) "Petitioner's U.S. constitutional rights under the 5th, 6th, and 14th Amendments and North Carolina constitutional rights under Article 1, Sections 19 and 23, were violated by the ineffective assistance of trial court counsel (pursuant to MAR Amendment filed December 19, 2022)" (id. at 26); and

9) "Petitioner's [s]tate and [f]ederal [c]onstitutional [r]ights were violated at the alleged checkpoint when law enforcement extended the stop beyond the time necessary to complete the mission of the stop" (id. at 28).

## IV. Habeas Standards

The Court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Further, "[b]efore [the C]ourt may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court. In other words, the state prisoner must give the

7

state courts an opportunity to act on his claims before he presents those claims to [the C]ourt in a habeas petition. The exhaustion doctrine . . . is now codified at 28 U.S.C. § 2254(b)(1)." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); see also 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement.").[2]

Additionally, the Court must apply a highly deferential standard of review in connection with habeas claims "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d). More specifically, the Court may not grant relief unless a state court decision on the merits "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. To qualify as "contrary to" United States Supreme Court precedent, a state court decision either must arrive at "a conclusion opposite to that reached by [the United States Supreme] Court on a question of law" or "confront[] facts that are materially indistinguishable from a relevant [United States] Supreme Court precedent and arrive[] at a result opposite" to the United States Supreme Court. Williams v.

---

[2] The Court may deny a claim on the merits despite a lack of exhaustion. See 28 U.S.C. § 2254(b)(2).

<u>Taylor</u>, 529 U.S. 362, 406 (2000).  A state court decision "involves an unreasonable application" of United States Supreme Court case law "if the state court identifies the correct governing legal rule from [the United States Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." <u>Id.</u> at 407; <u>see also</u> <u>id.</u> at 409–11 (explaining that "unreasonable" does not mean merely "incorrect" or "erroneous").

## V. <u>Discussion</u>

### A. Ground One

Via Ground One, Petitioner contends that "[t]he State did not afford Petitioner an opportunity to litigate his Fourth Amendment violation fully and fairly."  (Docket Entry 1, ¶ 12(Ground One).) In particular, Petitioner appears to argue that the state failed to provide him a full and fair opportunity to litigate the Fourth Amendment-based arguments in his motion to suppress based on 1) the North Carolina Court of Appeals's dismissal as unpreserved of Petitioner's challenge on direct appeal to the trial court's denial of his motion to suppress (<u>id.</u> at 17), 2) the trial court's denial of Petitioner's Amended MAR claim contesting the trial court's denial of the motion to suppress (<u>see</u> <u>id.</u>), and 3) the North Carolina Court of Appeals's denial of Petitioner's corresponding claim in his petition for a writ of certiorari (<u>see</u> <u>id.</u>).

In turn, Respondent asserts that, "[u]nder <u>Stone v. Powell</u>, 428 U.S. 465, 494 (1976), when 'the State has provided an

9

opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial'" (Docket Entry 6 at 12), but points out that "a State's failure to provide a 'full and fair opportunity' does not, in and of itself, entitle a petitioner to relief[ and instead] . . . only entitles a petitioner to federal habeas review of his Fourth Amendment claim(s)" (id. at 13 (quoting Stone, 428 U.S. at 494)). Respondent thus argues that "Petitioner's first ground should be denied as [] not cognizable." (Id.) Respondent additionally characterizes Ground One as "unexhausted and procedurally barred as Petitioner failed to present the substance of this claim to state courts on direct appeal, in his MAR, or in his [petition for a writ of certiorari]." (Id. at 12 n.2 (citing Baldwin v. Reese, 541 U.S. 27, 29 (2004), Lawrence v. Branker, 517 F.3d 700, 714 (4th Cir. 2008), and N.C. Gen. Stat. § 15A-1419(a)(1), (a)(3)).)

In reply, Petitioner concedes that Ground One "is not a claim for relief, but a claim notifying this Court that[, although] . . . Petitioner was provided a corrective mechanism [to redress his alleged Fourth Amendment violations], [ he] was precluded from using that mechanism by being denied a review of his Fourth Amendment claims on direct appeal and post conviction proceedings in the [North Carolina Court of Appeals]." (Docket

10

Entry 9 at 10 (emphasis added).)  With regard to exhaustion and the procedural bar, Petitioner contends that Ground One "came about when Petitioner sought redress in his [d]irect [a]ppeal and [p]ost [c]onviction [p]roceedings in the [North Carolina Court of Appeals]" and, thus, "[he] did all that he could do to litigate his Fourth Amendment violations." (Id. at 11.)

The United States Supreme Court has deemed federal habeas corpus relief unavailable for Fourth Amendment challenges "where the State has provided an opportunity for full and fair litigation of [the] Fourth Amendment claim." Stone, 428 U.S. at 482 (emphasis added); see also United States v. Scarborough, 777 F.2d 175, 182 (4th Cir. 1985) (holding that "Stone's requirement of an 'opportunity for full and fair litigation of Fourth Amendment claim' is met when state procedures provide a meaningful vehicle for a prisoner to raise a [F]ourth [A]mendment claim" (emphasis added) (internal citation omitted) (quoting Stone, 428 U.S. at 494)); Grimsley v. Dodson, 696 F.2d 303, 304 (4th Cir. 1982) (observing that Stone "marked, for most practical purposes, the end of federal court reconsideration of Fourth Amendment claims by way of habeas corpus petitions where the petitioner had an opportunity to litigate those claims in state court" (emphasis added)). Moreover, as Respondent has pointed out, "a State's failure to provide a 'full and fair opportunity' does not, in and of itself, entitle a petitioner to relief [ but, rather,] . . . only entitles

11

a petitioner to federal habeas review of his Fourth Amendment claim(s)" (Docket Entry 6 at 13 (quoting Stone, 428 U.S. at 494)). See, e.g., Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992) (holding that "review of [F]ourth [A]mendment claims in habeas petitions [is] undertaken . . . (a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process" (emphasis added)).

Here, in light of the above-quoted authorities and Petitioner's concession in his Reply that Ground One "is not a claim for relief" (Docket Entry 9 at 10 (emphasis added)), the Court should deny relief on Ground One.[3] To the extent Petitioner asserts Ground One serves as "a claim notifying this Court that[,

---

[3] Under North Carolina's post-conviction relief procedure, Petitioner can file a MAR "[a]t any time after verdict," N.C. Gen. Stat. § 15A-1415(a) (emphasis added); however, because Petitioner failed to raise the substance of Ground One in his direct appeal or in his Amended MAR, North Carolina's rules for procedural default would bar Ground One if Petitioner now attempted to raise that claim in a second MAR, see N.C. Gen. Stat. § 15A-1419(a) (providing as grounds for denial of MAR that, upon a previous MAR or appeal, the petitioner "was in a position to adequately raise the ground or issue underlying the present motion but did not do so"). Thus, Ground One, even if cognizable, also qualifies both as unexhausted and procedurally defaulted. To the extent Petitioner's assertion that Ground One "came about when Petitioner sought redress in his [d]irect [a]ppeal and [p]ost [c]onviction [p]roceedings in the [North Carolina Court of Appeals]" and, thus, "[he] did all that he could do to litigate his Fourth Amendment violations" (Docket Entry 9 at 11) constitutes an attempt to show cause sufficient to excuse his default, that attempt falls short. Petitioner could have raised in his Amended MAR an argument that the North Carolina Court of Appeals's dismissal of his Fourth Amendment claim on direct appeal denied him a full and fair opportunity to litigate that claim, but he did not do so (see Docket Entry 6-27 at 29-206).

12

although] . . . Petitioner was provided a corrective mechanism [to redress his alleged Fourth Amendment violations], [ he] was precluded from using that mechanism by being denied a review of his Fourth Amendment claims on direct appeal and post conviction proceedings in the [North Carolina Court of Appeals]" (id.), the undersigned will address that assertion in the analysis of Petitioner's Fourth Amendment-based arguments in Grounds Two and Nine.

## B. Grounds Two and Nine

Ground Two maintains that "[t]he trial court erred in [its order denying Petitioner's pre-trial motion to suppress in] determining that the checkpoint was appropriately tailored for determining compliance with motor vehicle laws." (Docket Entry 1, ¶ 12(Ground Two) (standard capitalization applied).) As "[s]upporting facts" for that Ground, Petitioner asserts as follows:

> On 20 February 2016, officers from Davidson County were set up at a checkpoint authorized for West 5th Avenue and Murphy Drive in Lexington, North Carolina with no alternate location. This checkpoint had been set up pursuant to an [sic] Check Point Authorization Plan and scheduled to conclude at 1:25 am, with a primary purpose to "check the drivers of the vehicles entering the checkpoint from all directions for motor vehicle violations." Despite the filed conclusion time of the checkpoint (1:25 am), and its primary location with "no" alternate location (W. 5th Avenue and Murphy Drive), [] Petitioner was seized at 1:39 am (with no stated deviations), on exit ramp 29-70 at West 5th Avenue (up the street from alleged checkpoint)[.]

13

(Docket Entry 1, ¶ 12(Ground Two)(a) (standard capitalization applied).) According to Petitioner, "[t]he [c]heckpoint must be operated in a reasonable manner pursuant to a neutral plan limiting the police officers' discretion" (Docket Entry 9 at 14 (internal quotation marks omitted) (citing Delaware v. Prouse, 440 U.S. 648, 654-55 (1979))), and "it is the officers [sic] adherence to their own guidelines (Checkpoint Authorization Plan) that makes a checkpoint constitutional under the Fourth Amendment" (id. at 15 (emphasis added)).

Petitioner's Ninth Ground for Relief, in turn, asserts that his "[s]tate and [f]ederal [c]onstitutional [r]ights were violated at the alleged checkpoint when law enforcement extended the stop beyond the time necessary to complete the mission of the stop." (Docket Entry 1 at 28.) In particular, Petitioner argues that, "after [a law enforcement officer] eventually clear[ed] his check of Petitioner's license plate and registration sticker, . . . the purpose of the seizure had been completed, and Petitioner should have been allowed to continue to travel[ b]ut[,] instead[,] . . . [a law enforcement officer] ask[ed ] Petitioner about [an] alleged smell of marijuana [coming from Petitioner's vehicle]." (Id. at 28-29.) Although Petitioner concedes that "[t]he smell of marijuana alone would give law enforcement probable cause," he contends that "the conversation [between law enforcement officers regarding the smell of marijuana] at the rear of

14

Petitioner's vehicle was never captured on [a law enforcement officer]'s belt mic[rophone]." (Id. at 29; see also Docket Entry 9 at 19 (citing Illinois v. Caballes, 543 U.S. 405, 407 (2005) (describing "question on which [the United States Supreme Court] granted certiorari . . . [as w]hether the Fourth Amendment requires reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop" (emphasis added) (internal quotation marks omitted)), and Florida v. Royer, 460 U.S. 491, 500 (1983) (holding that, under Fourth Amendment, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop," as well as that "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time").

Respondent contends that "Stone v. Powell precludes review of any alleged Fourth Amendment violation in Petitioner's Second . . . and Ninth Grounds" (Docket Entry 6 at 13 (capitalization, bold font, and block formatting omitted)), because "Petitioner had a full and fair opportunity to litigate his Fourth Amendment claims" (id. at 14). In that regard, Respondent points out that "Petitioner filed a motion to suppress [] evidence [obtained from the checkpoint stop] with the trial court" (id. (citing Docket Entry 6-3)), that "[t]he trial court held a pre-trial hearing on th[at motion]," at which "Petitioner argued his

15

position" (id. (citing Docket Entry 6-4 at 1)), and that "Petitioner again advanced his Fourth Amendment claims" on direct appeal, in his Amended MAR, and in his certiorari petition (id. (citing Docket Entry 1 at 99-125, Docket Entry 6-9 at 16-25, Docket Entry 6-27)). Respondent acknowledges that "Petitioner has alleged his trial counsel was ineffective for failing to object to the admission of evidence [arising from the checkpoint stop] at trial, but argues that Petitioner nonetheless had a full and fair opportunity to litigate his Fourth Amendment claim on numerous occasions." (Id. at 14-15 (citing Lacey v. Guyer, No. CV 17-116, 2019 WL 6331466, at *8 (D. Mont. Aug. 27, 2019), recommendation adopted, 2019 WL 6327209 (D. Mont. Nov. 26, 2019), aff'd sub nom. Lacey v. Gootkin, 856 F. App'x 645 (9th Cir. 2021), cert. denied, __ U.S. __, 142 S. Ct. 1435 (Mar. 28, 2022)).)

Petitioner's assertion that, although the State "provided a corrective mechanism [to redress Petitioner's alleged Fourth Amendment violations], [ he] was precluded from using that mechanism by being denied a review of his Fourth Amendment claims on direct appeal and post conviction proceedings in the [North Carolina Court of Appeals]" (Docket Entry 9 at 10) misses the mark. The United States Court of Appeals for the Fourth Circuit has made clear that federal district courts must focus on whether the State has provided defendants with a full and fair procedural mechanism to raise alleged Fourth Amendment violations, and that a

16

defendant's failure to fully avail himself of that mechanism does not remove the bar imposed by Stone:

> North Carolina has established a procedure for the suppression of unconstitutionally obtained evidence, N.C. Gen. Stat. [§§] 15A-971 to 15A-979. . . . [The petitioner] does not assert either that he lacked this opportunity or that, if he had availed himself of it, he would not have been afforded a full and fair opportunity for litigating his [F]ourth [A]mendment claim. The fact of the matter is that [the petitioner]'s counsel failed to make any objection, [F]ourth [A]mendment or otherwise, to the introduction of the [evidence in question]. Having failed to use the opportunity to litigate his [F]ourth [A]mendment claim in state court, [he] is foreclosed by [Stone] from pursuing it on federal habeas corpus.

Sallie v. North Carolina, 587 F.2d 636, 639 (4th Cir. 1978); see also Mbacke v. Jones, No. 1:13CV937, 2016 WL 183913, at *6 (M.D.N.C. Jan. 14, 2016) (unpublished) (Webster, M.J.) (observing that "Fourth Circuit has previously recognized that North Carolina's statutory scheme governing the litigation of motions to suppress, see N.C.G.S. §§ 15A-971-980, establishes 'an opportunity for the full and fair litigation' of Fourth Amendment claims" (quoting Sallie, 587 F.2d at 639)), recommendation adopted, 2016 WL 879306 (M.D.N.C. Mar. 7, 2016) (unpublished) (Biggs, J.); Smith v. Ballard, No. 2:09CV242, 2010 WL 3835715, at *27 (S.D.W. Va. Aug. 24, 2010) (unpublished) ("Because [the p]etitioner did not contest the admissibility of th[e] evidence during the trial, [he] waived his right to challenge the search and seizure of that evidence on appeal or in his habeas corpus proceedings. Nevertheless, [he] had a full and fair opportunity to litigate his Fourth Amendment claim

17

in the state courts and, thus, his Fourth Amendment claim is not cognizable in this federal habeas corpus proceeding."), recommendation adopted, 2010 WL 3835710 (S.D.W. Va. Sept. 29, 2010) (unpublished).[4]

Accordingly, the rule in Stone bars review of Grounds Two and Nine.[5]

_____

[4] Notably, a majority of the other federal courts of appeals take the same approach. See, e.g., Hubbard v. Jeffes, 653 F.2d 99 (3d Cir. 1991) (holding that a petitioner had a "full and fair opportunity" to present his Fourth Amendment claim to the state courts despite his counsel's failure to raise the claim, because the "failure to do so was not brought about by any restriction of the opportunity by the state courts"); Lenza v. Wyrick, 665 F.2d 804, 808 (8th Cir. 1981) ("[The] petitioner was clearly afforded the opportunity to raise his [F]ourth [A]mendment claim. He properly raised it in pretrial proceedings and at trial. He improperly did so before the state appellate court. The appellate court's refusal to examine [the] petitioner's claim in detail was justified by state procedural rules. Under such circumstances it cannot be held that [the] petitioner was denied the opportunity to fully and fairly litigate the issue." (internal footnote and citation omitted)); United States ex rel. Maxey v. Morris, 591 F.2d 386, 388–89 (7th Cir. 1979) ("We now hold that if a defendant had an opportunity to litigate his constitutional claim fully and fairly in the state courts, his failure to do so will not entitle him to obtain a federal writ of habeas corpus."); Caver v. Alabama, 577 F.2d 1188, 1192 (5th Cir. 1978) (ruling that, "if a state provides the processes whereby a defendant can obtain full and fair litigation of a [F]ourth [A]mendment claim, Stone v. Powell bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes"); Gates v. Henderson, 568 F.2d 830, 839 (2d Cir. 1977) (en banc) (finding Stone barred review of Fourth Amendment claim notwithstanding trial counsel's failure to object to evidence at trial, and ruling that "all that the [United States Supreme] Court required was that the state have provided the opportunity to the state prisoner for full and fair litigation of the Fourth Amendment claim"); Tisnado v. United States, 547 F.2d 452, 455 (9th Cir. 1976) (finding the petitioner had full and fair opportunity to litigate Fourth Amendment claims where "[h]e [] litigate[d] th[o]se claims at the time of his trial[, a]nd, although it d[id] not appear from the record that he in fact aired them on direct appeal, there [wa]s no showing that he was denied the 'opportunity' to do so").

[5] Moreover, to the extent Petitioner intended Ground Two's assertions that "[t]he trial court erred in [its order denying Petitioner's pre-trial motion to suppress in] determining that the checkpoint was appropriately tailored for determining compliance with motor vehicle laws" (Docket Entry 1, ¶ 12(Ground Two) (standard capitalization applied)) to raise a claim for violation of North Carolina law independent of any Fourth Amendment claim, such assertions remain non-cognizable on habeas review, see Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the

18

## C. Grounds Three, Four, and Five

Petitioner's Third Ground for Relief contends that "Section 20-16.3A of the North Carolina General Statutes is invalid as it violates the fundamental right to travel, protected by the Privileges or Immunities Clause [of the <u>Fourteenth Amendment</u>]." (Docket Entry 1, ¶ 12(Ground Three) (standard capitalization applied).) Petitioner's "[s]upporting facts" elaborate as follows:

> The right to travel has long been recognized as a fundamental aspect of American citizenship and liberty. When an individual is stopped at a checkpoint[,] law enforcement interferes with the individual's ability to travel. While North Carolina General Statute 20-16.3A allows law enforcement to establish such checkpoints, the statute is invalid because it unduly burdens and interferes with [] Petitioner's – and all drivers' – constitutional rights to travel. N.C. Gen. Stat. Section 20-16.3A unduly burdens the constitutionally-protected right to travel and is therefore unconstitutional and invalid. N.C. Gen. Stat. Section 20-16.3A must meet the constitutional strict scrutiny standard because it interferes with the right to travel. N.C. Gen. Stat. Section 20-16.3A fails a strict scrutiny review because it is not narrowly tailored and is therefore unconstitutional.

(Docket Entry 1, ¶ 12(Ground Three)(a) (standard capitalization applied) (stray commas omitted); <u>see also</u> Docket Entry 9 at 16-17 (arguing that "[t]he [United States] Supreme Court has consistently applied a strict scrutiny test to violations of the right to

---

Constitution, laws, or treaties of the United States."); <u>see also</u> <u>Wright v. Angelone</u>, 151 F.3d 151, 157 (4th Cir. 1998) ("It is black letter law that a federal court may grant habeas relief 'only on the ground that the petitioner is in custody in violation of the Constitution or law or treaties of the United States.' Because [the petitioner]'s claim, when pared down to its core, rests solely upon an interpretation of [state ] law . . ., it is simply not cognizable on federal habeas review." (quoting 28 U.S.C. § 2254(a)) (internal brackets and citations omitted).

travel[,]" and that "Section 20-16.3A fails a strict scrutiny review because it is not narrowly tailored and is therefore unconstitutional" (citing <u>Shapiro v. Thompson</u>, 394 U.S. 618, 661 (1969) (Harlan, J., dissenting), <u>overruled on other grounds by Edelman v. Jordan</u>, 415 U.S. 651, 670-71 (1974)))·.)

Continuing Petitioner's attack on Section 20-16.3A, his Fourth Ground for Relief maintains that "Section 20-16.3A of the North Carolina General Statutes is invalid as it violates the Equal Protection Clause [of the <u>Fourteenth Amendment</u>]." (Docket Entry 1, ¶ 12(Ground Four) (standard capitalization applied).) Petitioner's "[s]upporting facts" flesh out that Ground, in pertinent part, as follows:

> The chance of repeated placement of checkpoints in one area, leading to a disproportionate effect on minorities, violates the Equal Protection Clause. . . . Subsection (d) of Section 20-16.3A provides, "The placement of checkpoints should be random or statistically indicated, and agencies shall avoid placing checkpoints repeatedly in the same location or proximity. This subsection shall not be grounds for a motion to suppress or a defense to any offense arising out of the operation of a checking station." The current statue [sic] blatantly denies an individual constitutional rights without so much as a cursory justification for the operation and location of a checking station. The statute cannot support equal protection while sanctioning its violation at the same time.

(Docket Entry 1, ¶ 12(Ground Four)(a) (standard capitalization applied); <u>see also</u> Docket Entry 9 at 16-17 (contending that "Section 20-16.3A is facially invalid [under the Equal Protection Clause] because it bans the motion to suppress or a defense to any

offense arising out of the operation of a checking station[,]" as well as that "[t]he statute cannot support equal protection while sanctioning its violation at the same time" (citing N.C. Gen. Stat. § 20-16.3A(d))).)

In turn, Ground Five essentially repackages the contentions in Grounds Three and Four and asserts that "[t]he trial court erred in denying [Petitioner]'s motion to suppress based on the unconstitutionality of Section 20-16.3A" because, "[b]y barring motions to suppress or defenses to offenses arising out of the operation of a checking station, N.C. Gen. Stat. 20-16.3A(d) overtly sanctions the very discrimination it purports to prohibit and hamstrings the constitutionally-guaranteed right to travel, and denies citizens like [] Petitioner the equal protection of the law." (Docket Entry 1 at 20 (standard capitalization applied).)

Respondent contends that "Stone v. Powell precludes review of any alleged Fourth Amendment violation in Petitioner's . . . Third, Fourth, [and] Fifth . . . Grounds" (Docket Entry 6 at 13 (capitalization, bold font, and block formatting omitted)), because "Petitioner had a full and fair opportunity to litigate his Fourth Amendment claims" (id. at 14). Alternatively, Respondent asserts that Grounds Three, Four, and Five lack merit, because "[s]tate courts denied on the merits the claims underlying [those] grounds[,]" and "Petitioner has not shown the state courts' decisions were contrary to or involv[ed] an unreasonable

21

application of clearly established federal law or were based on [an] unreasonable determination of facts in light of the evidence presented during state court proceedings." (<u>Id.</u> at 15-16.)

Although Petitioner's Grounds Three, Four, and Five base their challenges to N.C. Gen. Stat. § 20-16.3A under the Privileges or Immunities and Equal Protection Clauses of the <u>Fourteenth Amendment</u>, rather than the <u>Fourth Amendment</u>, the Court should nevertheless find that the rule in <u>Stone</u> bars all three of those Grounds for Relief. Even assuming, <u>arguendo</u>, that Section 20-16.3A violated the Privileges or Immunities Clause and/or the Equal Protection Clause of the Fourteenth Amendment,[6] <u>that fact would not invalidate the checkpoint which led to the evidence supporting Petitioner's underlying convictions</u>. Petitioner has shown neither that the federal Constitution requires the existence of a valid <u>state statute</u> to authorize checkpoints (<u>see</u> Docket Entry 9 at 14 (citing <u>Delaware v. Prouse</u>, 440 U.S. 648, 654-55 (1979), for proposition that "[c]heckpoint must be operated in a reasonable manner pursuant to a <u>neutral plan</u> limiting the police officers'

---

[6] The North Carolina Court of Appeals has rejected both of Petitioner's challenges to N.C. Gen. Stat. § 20-16.3A under the Privileges or Immunities Clause and the Equal Protection Clause. <u>See</u> <u>State v. Macke</u>, 276 N.C. App. 242, 248, 855 S.E.2d 828, 833-34 (2021) (ruling that "N.C. Gen. Stat. § 20-16.3A[ ] authorizes the creation of traffic checkpoints," and that "[a] traffic checkpoint, with a purpose to discover and deter traffic violations, which does not stop travel altogether and only delays travel for a few moments, does not violate the right to free travel," as well as rejecting the defendant's argument "that N.C. Gen. Stat. § 20-16.3A(d) disallows any and all challenges to equal protection in violation of the Equal Protection Clause," because "N.C. Gen. Stat. § 20-16.3A(c) . . . allows a defendant to challenge a checkpoint under both the Constitution of the United States and the North Carolina Constitution").

22

discretion" (internal quotation marks omitted) (emphasis added))),
nor that the United States Supreme Court has ever held that the
right to travel arising from the Privileges or Immunities Clause of
the Fourteenth Amendment would, with or without an authorizing
state statute, bar the checkpoint at issue in this case (see Docket
Entries 1, 9).  Thus, even assuming the invalidity of Section 20-
16.3A, for Petitioner to demonstrate entitlement to relief, the
inquiry would, again, turn on whether the checkpoint constituted an
illegal search and seizure in violation of the Fourth Amendment, a
claim that Stone does bar.

     In short, the rule in Stone precludes review of Grounds Three,
Four, and Five.

## D. **Grounds Six and Seven**

     In Ground Six, Petitioner argues that "[t]he trial court erred
by denying [Petitioner]'s motion to dismiss the charge of
possession of a firearm by a felon which violated his U.S.
constitutional rights under the 4th, 5th, 6th, and 14th Amendments
and North Carolina constitutional rights under Article 1, Sections
18, 19, 20, 22, 23, 24, and 26." (Docket Entry 1 at 22 (standard
capitalization applied).)[7]  In support, Petitioner contends:

---

[7] To the extent that Petitioner's Ground Six relies upon an alleged
violation of the North Carolina Constitution, such a matter remains simply not
cognizable on federal habeas review.  See 28 U.S.C. § 2254(a) ("[A] district
court shall entertain an application for a writ of habeas corpus in behalf of a
person in custody pursuant to the judgment of a State court only on the ground
that he is in custody in violation of the Constitution or laws or treaties of the
United States." (emphasis added)); see also Estelle v. McGuire, 502 U.S. 62, 67
(1991) ("We have stated many times that 'federal habeas corpus does not lie for

23

The lack of state's evidence was insufficient [sic] to charge Petitioner with possession of a firearm. The firearm in question was found in the closest driveway to the checkpoint. Upon further examination of the firearm, there was no DNA or fingerprints connecting [] Petitioner to the firearm, nor did the state have any statements from [] Petitioner admitting possession of a firearm. The signed statements provided by the two other adult occupants in [] Petitioner's vehicle had no mention of a firearm either. Nor did any officer witness Petitioner discard any firearm from his vehicle.

(Id. (stray comma omitted).)

Relatedly, Petitioner's Ground Seven maintains that "[t]he State violated Petitioner's U.S. constitutional rights under the 4th, 5th, 6th, and 14th Amendments and North Carolina constitutional rights under Article 1, Sections 18, 19, 20, 2, 23, 24 and 26 by using erroneous video footage as evidence." (Docket Entry 1 at 24.)[8] In particular, Petitioner asserts that, "[a]t trial[,] the state used two videos as evidence allegedly taken from officers [sic] patrol vehicles[,]" and that, "[n]ot only do th[o]se videos show multiple inconsistencies to both officers [sic] testimonies, but there were discovery errors related to th[o]se videos as well." (Id. (standard capitalization applied).) Petitioner's Response to the instant Motion elaborates further:

[A law enforcement officer] initialled [sic] [a Certificate of Compliance with Law Enforcement Officer Discovery Responsibilities] stating there was [sic] no

_____

errors of state law.'" (emphasis added) (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990))).

[8] Ground Seven's assertion that the state violated various provisions of the North Carolina Constitution qualifies as non-cognizable on federal habeas review. See 28 U.S.C. § 2254(a); see also McGuire, 502 U.S. at 67.

other materials known to exist at the time of turning in
the discovery.  Going back, [that officer] marked out
those initials and then initialled [sic] in the second
column [sic], while stating that there was a DVD in-car
and it was located at: "Evidence of [sic] Lexington P.D."
[That officer] failed to give reason [sic] as to why
th[o]se videos were never copied.  Next, on [a p]age
[entitled] Defendant Identification Information, under
[the] subsection "Statements Made by This Defendant,"
[the] last column [sic] pertaining to tape (audio) and
video recordings, that was marked "Yes" by [the officer,]
states, "Pursuant to N.C.G.S. 15A-903(a), if you have any
video or audio taped footage in case, you 'must' provide
a copy of tapes when you submit report!" . . .  [A]fter
numerous attempts of Petitioner's counsel trying to
obtain a copy of this footage, [the officer]'s video was
produced two years later at Petitioner's suppression
hearing.  [Another law enforcement officer]'s video was
produced three years later at Petitioner's trial.
Petitioner contends that[,] at the court hearing right
before his suppression hearing, the [trial court] asked
the [district attorney] about th[o]se videos, and she
admitted that she had not had or seen the videos.
Besides the numerous inconsistencies of these tapes to
law enforcement testimonies, both officers work for
different agencies and both videos are on the same disc.
Nor were there any chain [sic] of authority to preserve
either video [sic] integrity.

(Docket Entry 9 at 20-21 (internal parenthetical citation omitted)

(standard punctuation and capitalization applied) (purporting to

quote Docket Entries 9-18, 9-19).)

Respondent maintains that "Petitioner is not entitled to

relief on his Sixth and Seventh Grounds because they are

procedurally defaulted."  (Docket Entry 6 at 25 (all caps, bold

font, and block formatting omitted).)  In support of that argument,

Respondent points out that "[t]he [trial] court summarily denied

the claims underlying Petitioner's [S]ixth and [S]eventh Grounds

because Petitioner had not complied with N.C.G.S. § 15A-

25

1419(a)(3)'s requirement that he raise those claims on direct appeal while in an adequate position to do so." (Id. (referencing Docket Entry 6-22 at 4-5).) According to Respondent, "the Fourth Circuit has 'consistently held that § 15A-1419(a)(3) is an independent and adequate state ground for purposes of procedural default.'" (Id. at 27 (quoting Lawrence, 517 F.3d at 714).) Further, Respondent notes that the fact "[t]hat the [trial] court also decided the [parallel MAR claims to Grounds Six and Seven] on the merits after holding the claim[s] w[ere] procedurally barred has no effect on the procedural default from federal habeas review." (Id. (citing Harris v. Reed, 489 U.S. 255, 264 n.10 (1989); see also id. (quoting Ashe v. Styles, 39 F.3d 80, 86 (4th Cir. 1994), for proposition that, "'[w]here a state court both addresses the merits of the federal question but also invokes a state procedural bar that is adequate and independent of federal law as an independent ground for decision, a federal court must accord respect to the state law ground for decision'").)[9]

Petitioner's Amended MAR raised parallel claims to Grounds Six and Seven (see Docket Entry 1 at 158-85); however, as Respondent has argued (see Docket Entry 6 at 25-27), the trial court denied those claims pursuant to N.C. Gen. Stat. § 15A-1419(a)(3), because

---

[9] In the alternative, Respondent urges the Court to deny Grounds Six and Seven as meritless (see Docket Entry 6 at 28), contending that Petitioner has failed to show that the trial court's denial of Petitioner's parallel Amended MAR claims on their merits "was contrary to or an unreasonable application of clearly established federal law" (id. at 29).

26

Petitioner "was in a position to adequately raise th[e claims] in his appeal, but he did not" (Docket Entry 6-22 at 4-5). As both of those Amended MAR claims arose from matters of record at the time of Petitioner's direct appeal, the trial court properly concluded that he could have presented them on direct appeal and, thus, that Section 15A-1419(a)(3) barred their review via MAR. Moreover, the Fourth Circuit "ha[s] consistently held that § 15A-1419(a)(3) is an independent and adequate state ground for purposes of procedural default," Lawrence, 517 F.3d at 714, and the trial court's alternate ruling on the merits of those claims (see Docket Entry 6-22 at 4-5) does not alter this Court's duty to enforce the trial court's procedural default ruling, see Harris, 489 U.S. at 264 n.10 ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."); accord Ashe, 39 F.3d at 86.

"Federal habeas review of a state prisoner's claims that are procedurally defaulted under independent and adequate state procedural rules is barred unless the prisoner can show cause for the default and demonstrate actual prejudice as a result of the alleged violation of federal law, or prove that failure to consider the claims will result in a fundamental miscarriage of justice."

27

<u>McCarver v. Lee</u>, 221 F.3d 583, 588 (4th Cir. 2000). Accordingly, Petitioner must show either cause and actual prejudice or a miscarriage of justice, in order to proceed with Grounds Six and Seven.

In Petitioner's Response, he concedes "that his Sixth [Ground] was objected to at trial, and [that] his appeal attorney could have, but did not[,] bring th[e substance of Ground Six] up on direct appeal" (Docket Entry 9 at 20), but makes no attempt to argue that cause and prejudice or a fundamental miscarriage of justice excused his default (<u>see</u> <u>id.</u>). The Court therefore should deny Ground Six as procedurally barred.

With regard to Ground Seven, Petitioner "contends that he was never in adequate position to raise [the substance of Ground] Seven on direct appeal[,]" because "[the substance of Ground] Seven was never objected to, nor preserved for appellate review due to ineffective assistance from trial court counsel." (Docket Entry 9 at 20 (stray comma and parenthetical material omitted).) In Petitioner's view, "[o]nce [he] discovered this error, he brung [sic] it forth in his [Amended] MAR." (<u>Id.</u>)

Petitioner's argument appears to contest the trial court's conclusion that a procedural bar under Section 15A-1419(a)(3) applied to Petitioner's parallel Amended MAR claim, rather than to show that cause and actual prejudice or a fundamental miscarriage of justice exist to excuse his default. The trial court, however,

28

did not err in concluding that a procedural bar applied under Section 15A-1419(a)(3) because, notwithstanding the alleged failure of Petitioner's trial counsel to object at trial to the admission of the video footage, Petitioner still could have raised the substance of Ground Seven on direct appeal under the plain error rule, see N.C. R. App. P. 10(a)(4) ("In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error.").[10]

Moreover, even if the Court construes Petitioner's argument as an attempt to show that his trial counsel's alleged failure to object at trial to the introduction of the law enforcement officers' video footage of the checkpoint stop qualifies as sufficient cause to excuse Petitioner's procedural default, that argument also fails. As discussed in more detail in connection with Petitioner's Eighth Ground for Relief, Petitioner has not shown that a meritorious basis existed for objecting to the admission of the officers' video footage and, thus, he has not

---

[10] Indeed, Plaintiff challenged the denial of his motion to suppress on direct appeal notwithstanding his trial counsel's failure to preserve that issue at trial. See Ellis, 2020 WL 6140639, at *5. Even though the North Carolina Court of Appeals dismissed that assignment of error as unpreserved, see id., the trial court did not deny his parallel, motion-to-suppress-based Amended MAR claims on grounds of procedural default (see Docket Entry 6-22 at 4; Docket Entry 6-24 at 4-7).

29

shown that his trial counsel provided ineffective assistance by failing to do so, see Oken v. Corcoran, 220 F.3d 259, 269 (4th Cir. 2000) ("[T]rial Counsel [i]s not constitutionally ineffective in failing to object . . . [when] it would have been futile for counsel to have done so . . . ."). Accordingly, Petitioner has failed to provide grounds to excuse his default of Ground Seven.

In sum, Grounds Six and Seven face a procedural bar.

## E. Ground Eight

Petitioner's Eighth Ground for Relief contends that "Petitioner's U.S. constitutional rights under the 5th, 6th, and 14th Amendments and North Carolina constitutional rights under Article 1, Sections 19 and 23, were violated by the ineffective assistance of trial court counsel (pursuant to MAR Amendment filed December 19, 2022)." (Docket Entry 1 at 26.)[11] In support of that Ground, Petitioner asserts that his trial counsel 1) "forfeited Petitioner's motion to suppress appeal, by not properly preserving it at trial," 2) "failed to make timely objections which resulted in a failure to subject the state's case to meaningful adversarial testing by not objecting to where [] Petitioner was stopped at[ ] th[e] alleged checkpoint," 3) "failed to object to the way law enforcement conducted this alleged checkpoint when they illegally extended the stop longer than necessary to complete the stop's

---

[11] The Court should deem non-cognizable Petitioner's assertions that his trial counsel's deficient performance violated provisions of the North Carolina Constitution. See 28 U.S.C. § 2254(a); see also McGuire, 502 U.S. at 67.

mission," 4) "failed to object to and impeach [a] state's witness due to her inability to tell the truth while testifying against her written and sworn statements," and 5) "fail[ed] to investigate evidence and fail[ed] to object to the admission of erroneous video footage." (Id. (stray comma omitted); see also Docket Entry 9 at 19 (making similar contentions regarding ineffectiveness of trial counsel).) For the reasons that follow, none of those ineffective assistance sub-claims, either individually or in totality, entitles Petitioner to relief.

The Fourth Circuit has provided guidance in regards to the clearly established law governing ineffective assistance claims:

> In order to establish an ineffective assistance of counsel claim . . ., [a petitioner must] establish that his "counsel's representation fell below an objective standard of reasonableness," measured by the "prevailing professional norms," [Strickland v. Washington, 466 U.S. 668, 688 (1984)], and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694. "Unless a [petitioner] makes both showings, it cannot be said that the conviction or . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687.

> In determining whether counsel's performance was deficient, "[i]t is all too tempting for a [petitioner] to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689. Hence, "court[s] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (internal quotation marks omitted).

31

> Similarly, in evaluating whether [a petitioner] has shown
> actual prejudice from any such deficient performance, it
> is insufficient for the [petitioner] "to show that the
> errors had some conceivable effect on the outcome of the
> proceeding," because "[v]irtually every act or omission
> of counsel would meet that test." Id. at 693.  Rather,
> a "reasonable probability" that the result would have
> been different requires "a probability sufficient to
> undermine confidence in the outcome." Id. at 694.

Fisher v. Lee, 215 F.3d 438, 446-47 (4th Cir. 2000) (parallel citations omitted).

Moreover, the United States Supreme Court has cautioned that "[s]urmounting *Strickland*'s high bar is never an easy task. . . . Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." Harrington v. Richter, 562 U.S. 86, 105 (2011) (internal quotation marks omitted).  Further, "[w]here the issue is whether the state court has unreasonably applied *Strickland* standards to a claim of ineffective assistance of counsel, . . . double deference is required. . . ." Lavandera–Hernandez v. Terrell, No. 1:12CV553, 2013 WL 1314721, at *4 (M.D.N.C. Mar. 28, 2013) (unpublished) (Schroeder, J.) (internal quotation marks omitted), appeal dismissed, 539 F. App'x 159 (4th Cir. 2013); see also Harrington, 562 U.S. at 105 ("The standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." (internal citations and quotation marks omitted)).

32

Accordingly, when the Court's examination of an ineffective assistance claim proceeds under Section 2254(d), "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." Harrington, 562 U.S. at 105; see also Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (observing that Section 2254(d) imposes "a difficult to meet and highly deferential standard . . ., which demands that state-court decisions be given the benefit of the doubt . . . [and that a] petitioner carries the burden of proof" (internal citations and quotation marks omitted)). In other words, "under the dual, overlapping lenses of [Section 2254(d) ] and *Strickland* [the Court must] ask[ ] the following question: Was the [trial court]'s holding incorrect to a degree that its conclusion was so lacking in justification that it was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement?" Moore v. Hardee, 723 F.3d 488, 496 (4th Cir. 2013) (internal brackets, ellipses, and quotation marks omitted).

Petitioner's first ineffective assistance sub-claim faults his trial counsel for failing to object at trial to preserve the right to contest on direct appeal the trial court's denial of Petitioner's motion to suppress. (See Docket Entry 1 at 26; see also Docket Entry 9 at 19.) Petitioner raised the substance of this claim in his Amended MAR (see Docket Entry 1 at 185-94), and the trial court, after ordering a full set of briefing on the

33

matter (see Docket Entry 6-24 at 7; see also Docket Entry 6-23 (State's Response to Amended MAR); Docket Entry 6-25 (Petitioner's counseled Reply Brief)), provided the following detailed and thorough rationale for denying that claim on the merits:

## CONCLUSIONS OF LAW

. . .

2. [Petitioner] cites *Roe v. Flores-Ortega*, in which the attorney for the defendant was ineffective for failing to file notice of appeal and thereby "deprived [the defendant] of the appellate proceeding altogether." 528 U.S. 470, 483 (2000). There, the United States Supreme Court held that "'the adversary process itself' has been rendered 'presumptively unreliable.'" *Id.* (quoting *United States v. Cronic*, 466 U.S. 648, 659 (1984)). Here, however, [Petitioner] exercised and exhausted his right to appeal. He was only prevented from arguing claims which were unpreserved. Therefore, the adversary process cannot be presumed unreliable, and neither can th[e c]ourt presume prejudice. Instead, th[e c]ourt must conduct a traditional *Strickland* analysis of ineffective assistance of counsel claims without the presumption of prejudice as prescribed in *Roe*.

3. To establish ineffective assistance of counsel:

> [f]irst, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*State v. Mewborn*, 200 N.C. App. 731, 738, 684 S.E.2d 535, 540 (2009) (quoting *Strickland* [], 466 U.S. [at] 687 []).

4. Counsel's "failure to object to admissible evidence does not constitute an error which would satisfy the

34

first prong of the *Strickland* test." []*Mewborn*, 200 N.C. App. [at] 738, 684 S.E.2d [at] 540 [] (citing *State v. Lee*, 348 N.C. 474, 492, 501 S.E.2d 334, 345 (1998)). Therefore, if the evidence at issue here is admissible, then there is no error for counsel's failure to object, and [Petitioner] fails to allege a claim of ineffective assistance of counsel.

5. Here, the trial court conducted a pre-trial evidentiary hearing and made the following conclusions of law about the validity of the checkpoint:

> I. that the checkpoint plan and execution complied with the provisions under N.C. Gen. Stat. 20-16.3A;
> II. that the checkpoint had the lawful and proper primary programmatic purpose of determining compliance with motor vehicle laws, not general crime control; and
> III. that after weighing the intrusiveness and burden on motorists, and "upon consideration of a balancing of the public's interest and the individual's right to personal security free from arbitrary interference by officers, the checkpoint was reasonable."

. . .

7. There is a two-step analysis when considering the validity of checkpoints. Courts must first determine whether a checkpoint has a "legitimate programmatic purpose." *State v. Veazey*, 191 N.C. App. 181, 185, 662 S.E.2d 683, 686 (2008) (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 46 (2000)). If satisfied, a court then assesses the individualized reasonableness of the checkpoint. [*Id.*] at 185-86, 662 S.E.2d at 687 (citing *Illinois v. Lidster*, 540 U.S. 419, 426 (2004)).

8. [Petitioner]'s allegations at the Motion to Suppress hearing and in his [Amended] MAR are twofold. He first contended that checking motor vehicle violations is an unlawful primary programmatic purpose. He next argued that, under the second prong of *Brown*[ *v. Texas*, 443 U.S. 47, 51 (1979)], the checkpoint was not sufficiently narrowly tailored regarding the location and extension of the ending time, and under the third prong, that officers had too much discretion.

35

**The Checkpoint has a Valid Primary Purpose**

9. "The United States Supreme Court has previously suggested that checking for drivers' license and vehicle registration violations is a lawful primary purpose for a checkpoint. North Carolina Courts have also upheld checkpoints designed to uncover drivers' license and vehicle registration violations." *Veazey*, 191 N.C. App. at 189, 662 S.E.2d at 689 (citations and quotation marks omitted).

10. However, as [Petitioner] alleged, "it is unclear whether a primary purpose of finding any and all motor vehicle violations is a lawful primary purpose." *Id.* "One reason that a checkpoint is an appropriate tool for helping police discover certain types of motor vehicle violations is that the police cannot discover such violations simply by observing a vehicle during normal road travel." *Id.* at 189-90, 662 S.E.2d at 689.

11. Additionally:

> where there is no evidence in the record to contradict the State's proffered purpose for a checkpoint, a trial court may rely on the testifying police officer's assertion of a legitimate primary purpose. However, where there is evidence in the record that could support a finding of either a lawful or unlawful purpose, a trial court cannot rely solely on an officer's bare statements as to a checkpoint's purpose.

[*Id.* ] at 187, 662 S.E.2d at 687 (citations omitted).

12. This includes when an officer's testimony varies regarding the primary programmatic purpose of that checkpoint. [*State v.*] Gabriel, 192 N.C. App. [517,] 522, 665 S.E.2d [581,] 585 [(2008)] (officer's testimony on the primary purpose varied between checking licenses, to potentially investigating recent robberies, and to issuing citations for "anything that came through."). In such cases, a trial court must "'carry out a close review of the scheme at issue.'" [*State v.*] Rose, 170 N.C. App. [284,] 289, 612 S.E.2d [336,] 339 (quoting *Ferguson v. City of Charleston*, 532 U.S. 67, 81 (2001)).

36

13. Here, there is sufficient evidence to support a finding of a lawful primary programmatic purpose of the checkpoint. The supervising officer's testimony indeed varied about the primary purpose of the checkpoint, describing both "motor vehicle violations coming through" and "checking driver's license and registration." Additionally, the checkpoint authorization form included a default justification of "[c]ompliance with motor vehicle laws." This is the same subtle but potentially dispositive issue identified in *Veazey*. However, here, the variation does not affect a finding of a lawful primary programmatic purpose.

14. The supervising officer testified that the checkpoint authorization form's justification, "compliance with motor vehicle laws," is derived directly from the Lexington Police Department's Policy and Procedural Manual ("the manual"). For motor vehicle compliance checkpoints like the one that [Petitioner] alleges was unlawful, the manual specifically limits the scope to ensuring "compliance with the motor vehicle laws governing *licensure, registration, insurance and impaired driving*" (emphasis added).

15. Therefore, while the language may suggest a more sweeping justification, the manual limits the scope of these checkpoints and shows this particular checkpoint was not designed to be a dragnet for all potential motor vehicle law violations. Instead, the checkpoint was limited in its purpose to the enumerated issues of licensure, registration, insurance, and impaired driving. Importantly, these are each types of violations that are not easily detectable, which satisfies the concerns expressed in *Prouse* and *Veazey*. Therefore, despite the subtle variation in the language of the checkpoint's justification from the supervising officer and the checkpoint authorization form, the purpose was limited to the valid, enumerated issues in the manual. As such, this checkpoint had a lawful primary programmatic purpose of ensuring compliance with the motor vehicle laws governing licensure, registration, insurance, and impaired driving.

**<u>The Checkpoint was Reasonable</u>**

16. [Petitioner]'s next allegations, that the checkpoint was unreasonable because it was inappropriately tailored and the officers had too much discretion, also fail.

37

17. To determine a checkpoint's reasonableness, a "court must weigh the public's interest in the checkpoint against the individual's Fourth Amendment privacy interest." *Veazey*, 191 N.C. App. at 186, 662 S.E.2d at 687 (citations omitted). Courts use a three-prong test to conduct this balancing inquiry, weighing:

> I. the gravity of the public concerns served by the seizure;
> II. the degree to which the seizure advances the public interest; and
> III. the severity of the interference with individual liberty.

*Brown*[], 449 U.S. [at] 51[ ]. "If, on balance, these factors weigh in favor of the public interest, the checkpoint is reasonable and therefore constitutional." *Veazey*, 191 N.C. App. at 186, 662 S.E.2d at 687. [Petitioner] raised no allegations under *Brown*'s first prong.

<u>*Brown Prong II*</u>

18. Under the second *Brown* prong, courts determine whether a checkpoint is "appropriately tailored" by considering non-exclusive factors such as:

> I. whether the police spontaneously decided to set up the checkpoint on a whim;
> II. whether the police offered any reason why a particular road or stretch of road was chosen for the checkpoint;
> III. whether the checkpoint had a predetermined starting or ending time; and
> IV. whether police offered any reason why the particular time span was selected.

[*Id.* ] at 191, 662 S.E.2d at 690 (citing *Rose*, 170 N.C. App. at 295, 612 S.E.2d at 342-43).

19. Here, the State introduced evidence that:

> I. the department selected this location for its high volume of traffic and "speeding points;"
> II. the checkpoint's purpose was to check for motorists' license and registration and motor vehicle violations;

38

III. the department predetermined the time span of 11:00 pm to 1:25 am;

IV. the officers implemented the checkpoint under the prewritten department checkpoint policy and procedure manual;

V. the checkpoint was only extended, in accordance with the manual, at the supervising sergeant's discretion, which he exercised because of the consistent flow of traffic[;] and

VI. the officers stopped [Petitioner]'s vehicle at 1:39 am, fourteen minutes after the 1:25 am scheduled end time.

20. The facts support a finding of appropriate tailoring because the department planned the checkpoint and selected the time and location out of concern for speeding, followed their prewritten checkpoint policy instructions, and the supervising officer only extended the two-hour checkpoint by fourteen minutes because they were actively checking motorists as the selected end time lapsed. *Compare* [ ] *Veazey*, 201 N.C. App. [at] 404, 689 S.E.2d [at] 534 [] (affirming a finding of appropriate tailoring where officers obtained prior approval from supervisor and selected a stretch of road because of prior motor vehicle law violations) *with Rose*, 170 N.C. App. at 294, 612 S.E.2d at 342 (skeptical of appropriateness of tailoring where spontaneous checkpoint had no prior agreement for time span, and no reason for the selected stretch of road).

*Brown Prong III*

21. Turning to the third *Brown* factor, "the severity of the interference with individual liberty," courts focus on the level of field officer discretion, cautioning that "a checkpoint 'must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.'" *Rose*, 170 N.C. at 295, 612 S.E.2d at 343 (quoting *Brown*, 443 U.S. at 51). "There must be orderly procedures to limit the 'unfettered discretion of officers in the field' in order to avoid the 'arbitrary invasion' of motorists' privacy interests." [*Id.* ] (quoting *Brown*, 443 U.S. at 51).

22. Some non-exclusive factors that courts consider for officer discretion and individual privacy are:

39

[1] the checkpoint's potential interference
with legitimate traffic; [2] whether police
took steps to put drivers on notice of an
approaching checkpoint; [3] whether the
location of the checkpoint was selected by a
supervising official, rather than by officers
in the field; [4] whether police stopped every
vehicle that passed through the checkpoint, or
stopped vehicles pursuant to a set pattern; [5]
whether drivers could see visible signs of the
officers' authority; [6] whether police
operated the checkpoint pursuant to any oral or
written guidelines; [7] whether the officers
were subject to any form of supervision; and
[8] whether the officers received permission
from their supervising officer to conduct the
checkpoint.

*Veazey*, 191 N.C. App. at 193, 662 S.E.2d at 691.

23. Here, each of these factors suggests a proper
restraint on discretion in favor of individual privacy at
the checkpoint:

> I. Some stops lasted as little as 30-40
> seconds;
> II. The officers were uniformed, and at least
> one squad car had activated lights to notify
> oncoming motorists of the checkpoint's
> presence and the officers' authority;
> III. The supervising officer selected the
> stretch of road because of speeding concerns;
> IV. By prior determination, the checkpoint
> stopped all vehicles;
> V. The officers operated pursuant to the
> Lexington Police Department's manual for
> checkpoints;
> VI. A supervising officer briefed the patrol
> officers before the checkpoint began and
> remained on scene for the duration of the
> checkpoint; [and]
> VII. A supervising officer approved the
> checkpoint beforehand.

*Cf. Rose*, 170 N.C. App. at 297, 612 S.E.2d at 344
(concern about the officers' discretion where there was
"no plan, no time frame, no supervision, and no direction
from anyone (oral or written) about how to conduct these

40

wholly spontaneous checkpoints. Indeed, there was not even anyone in charge.").

24. In sum, the checkpoint was reasonable in light of the *Brown* factors.

> I. [Petitioner] did not contest the first prong (gravity of the public concerns served by the seizure). Compliance with motor vehicle laws governing licensure, registration, insurance and impaired driving is a grave public concern addressed by this seizure. *See Veazey*, 201 N.C. App. at 405, 689 S.E.2d at 534 (affirming a finding of strong State interest in enforcing motor vehicle laws).
> II. The checkpoint was appropriately tailored to meet this purpose by implementing and following a specific plan according to the department's checkpoint manual.
> III. The checkpoint effected a minimal intrusion on motorists' liberty because the officers implemented the plan without unfettered discretion and under direction from prior written policies and a supervising officer.

25. Because th[e c]ourt finds the checkpoint was valid as to its primary purpose and its reasonableness, [Petitioner] cannot demonstrate deficient performance by his trial counsel in failing to object and preserve the issue for appeal. Thus, trial counsel did not render ineffective assistance of counsel alleged by [Petitioner] in Claim VII of his [Amended] MAR.

(Docket Entry 6-26 at 4-11 (internal footnotes and United States Supreme Court parallel citations omitted) (missing parenthesis added).)

Here, Petitioner merely repeats the same allegations he made in his Amended MAR (compare Docket Entry 1 at 26, and Docket Entry 9 at 19, with Docket Entry 1 at 185-94), and argues neither that the trial court contradicted and/or unreasonably applied clearly

41

established federal law, nor that the court unreasonably determined the facts in light of the evidence (see Docket Entry 1 at 26; see also Docket Entry 9 at 19). Moreover, the trial court's lengthy, detailed analysis makes clear that it reasonably applied both the clearly established test for ineffective assistance set forth in Strickland and its progeny, as well as the clearly established United States Supreme Court law governing the reasonableness of checkpoints under the Fourth Amendment. (See Docket Entry 6-26 at 4-11 (citing Lidster, Ferguson, Edmond, Flores-Ortega, Strickland, Cronic, Prouse, and Brown).) Under the doubly deferential standard of review, Petitioner's first ineffective assistance subclaim falls short.

Petitioner's second ineffective assistance subclaim asserts that his trial counsel "failed to make timely objections which resulted in a failure to subject the state's case to meaningful adversarial testing by not objecting to where [] Petitioner was stopped at[ ] th[e] alleged checkpoint." (Docket Entry 1 at 26; see also Docket Entry 9 at 19.) Petitioner's materials in this Court fail to provide any further facts in support of that subclaim (see id.),[12] but the Court could, in according Petitioner's pro se

---

[12] Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts "explicitly requires that a petitioner summarize the facts supporting each of the alleged grounds for relief." Adams v. Armontrout, 897 F.2d 332, 333 (8th Cir. 1990). Thus, a habeas petitioner who generally references allegations raised in other case records and briefs "patently fail[s] to comply with Rule 2(c)." Id. Federal courts need not "sift through voluminous documents filed by habeas corpus petitioners in order to divine the grounds or facts which allegedly warrant relief." Id. (citing Williams v. Kullman, 722 F.2d 1048, 1051 (2d Cir. 1983)). The particularized facts which entitle a petitioner

42

assertions a liberal construction, consider the following factual contentions in Petitioner's parallel subclaim in his Amended MAR:

> [A law enforcement officer] imposed on the [c]ourts that [Petitioner] was stopped as he approached the checkpoint on West 5th Avenue at Murphy Drive. But [that officer]'s recollection isn't consistent with the facts. Even though this checkpoint was authorized for West 5th Avenue at Murphy Drive with no alternate location, [Petitioner] was flagged down and stopped by [two law enforcement officers ] up the street from the location of the checkpoint coming off of the Interstate 85 South on Exit Ramp 29-70 at West 5th Avenue. Being that law enforcement does not have unlimited authority to stop vehicles without suspicion, and that [Petitioner]'s location at the time of his stop is very important to this case, the justification of a checkpoint for West 5th Avenue at Murphy Drive with no alternate location[] should not be a justification to allow law enforcement to use their unfettered discretion[] to stop [Petitioner] on Exit Ramp 29-70 at West 5th Avenue (up the street from where the actual checkpoint was authorized). The failure of [Petitioner]'s lawyer to object to the location of [Petitioner]'s stop, specified by law enforcement and the State, lead [sic] the [trial c]ourt[] and jury to believe that the law enforcement at this alleged checkpoint was working within their authorization. Since there is a chance the outcome of [Petitioner]'s case would have been different, [Petitioner]'s [trial counsel]'s failure to object to or raise this claim resulted in prejudice.

(Docket Entry 1 at 194-97 (internal parenthetical citations omitted).)

Although the trial court denied Petitioner's entire, parallel ineffective assistance of counsel claim in his Amended MAR on the merits (see Docket Entry 6-24 at 11), that court did not expressly discuss Petitioner's second ineffective assistance subclaim (quoted

---

to habeas relief "must consist of sufficient detail to enable the court to determine, from the face of the petition alone, whether the petition merits further habeas corpus review." Id. at 334 (emphasis added).

43

above) (see id. at 4-11), likely because Petitioner's appointed counsel provided arguments in the court-ordered Reply Brief directed only at Petitioner's first subclaim that trial counsel failed to preserve the motion to suppress issue for appeal (see Docket Entry 6-25). Nevertheless, unless circumstances indicate otherwise (not present here), even an unexplained, summary order constitutes an adjudication on the merits for purposes of § 2254(d) deference. See Harrington, 562 U.S. at 98-100.

Under the double deference owed the trial court's ruling under Section 2254(d) and Strickland, the Court should find that the trial court neither contravened/unreasonably applied clearly established federal law nor unreasonably applied the facts in denying Petitioner's parallel subclaim in his Amended MAR. Although Petitioner contends that the testimony of one officer regarding the location of the checkpoint stop lacked "consisten[cy] with the facts" (Docket Entry 1 at 195 (emphasis added)), Petitioner has not explained which "facts" he intended to reference, particularly given that the location of the checkpoint stop constituted one of the questions of fact that the jury had yet to determine. Moreover, Petitioner's mere disagreement with the officer's trial testimony regarding the location of the checkpoint stop did not provide his trial counsel with a valid basis for an objection. See Azkour v. Little Rest Twelve, No. 10CV4132, 2017 WL 1609125, at *7 (S.D.N.Y. Apr. 28, 2017) (unpublished) ("[T]he fact

44

that certain evidence contradicts [the plaintiff's] testimony is obviously not a proper basis for excluding that evidence."). Significantly, Petitioner argues neither that his trial counsel failed to impeach the officer on cross-examination regarding the location of the checkpoint stop, nor that his trial counsel provided ineffective assistance by failing to call Petitioner (or another witness) to testify regarding the location of the stop. (See Docket Entries 1, 9.) Petitioner simply has not raised a valid basis for his trial counsel to have objected at trial, and, thus, Petitioner has not established that his trial counsel either provided deficient performance or caused any prejudice by failing to do so. See Oken, 220 F.3d at 269 ("[T]rial Counsel [i]s not constitutionally ineffective in failing to object . . . [when] it would have been futile for counsel to have done so . . . .").

Next, Petitioner maintains in his third ineffective assistance subclaim that his trial counsel "failed to object to the way law enforcement conducted this alleged checkpoint when they illegally extended the stop longer than necessary to complete the stop's mission." (Docket Entry 1 at 26; see also Docket Entry 9 at 19.) Again, Petitioner fails to provide any further factual support or legal argument for this subclaim in his filings in this Court but, in light of his pro se status, the Court could look to facts and

arguments Petitioner provided in his Amended MAR's parallel
subclaim:

> In [<u>Rodriguez v. United States</u>], 575 U.S. [348, 354
> (2015)], the Supreme Court ultimately ruled that a stop
> may not be extended beyond the time necessary to complete
> the "mission" of the stop, which is "to address the
> traffic violation that warranted the stop, and attend to
> related safety concerns." In other words, "[a]uthority
> for the seizure thus ends when tasks tied to the [stop]
> are - or reasonably should have been [-] completed.["
> <u>Id.</u>] . . .

> At this alleged checkpoint, [Petitioner] was first
> approached by [a law enforcement officer], as [another
> officer] went to the rear of [Petitioner]'s vehicle to
> inspect [his] registration sticker. After [the officer]
> receives [Petitioner]'s license, and after [the other
> officer] eventually clears his registration check[,
> i]nstead of [the officer] allowing [Petitioner] to leave,
> [the officer] decides to leave [Petitioner]'s window and
> walks to the rear of [Petitioner]'s vehicle to meet with
> [the other officer]. [The officers] tried justifying the
> extension of the stop by testifying that[,] after [the
> officer] received [Petitioner]'s license, and after [the
> other officer] cleared [Petitioner] of his registration
> check, [the officer] leaves [Petitioner]'s window to walk
> to the rear of the vehicle to speak with [the other
> officer] about the smell of marijuana and then hands [the
> other officer Petitioner]'s license. Even though [the
> officer's] actions were not typical law enforcement
> protocol concerning the alleged smell of marijuana, <u>the
> smell of marijuana would be a valid reason for probable
> cause in this case as [one of the officers] explained at
> trial</u>. But neither [officers'] testimonies add up to the
> evidence presented by the State at trial. On the audio
> that was recorded on [one of the officer's] belt
> mic[rophone], the [trial] court was able to hear [the
> officer] clearing his registration check of
> [Petitioner]'s vehicle, and then the audio goes next to
> [that officer] at [Petitioner]'s window asking about
> marijuana after [that officer] had obtained
> [Petitioner]'s license from [the other officer]. Not
> once will you hear on the audio a discussion that [the
> officers] allegedly had about marijuana at the rear of
> [Petitioner]'s vehicle. <u>By not objecting to this illegal
> extension of [Petitioner]'s stop, [trial counsel] lead</u>

46

> [sic] the [trial c]ourt[] and jury to believe that the
> law enforcement's conduct at this alleged checkpoint was
> constitutional, and the additional investigation into
> drugs was proper and legal. Since there is a chance the
> outcome of [Petitioner]'s case would have been different,
> [Petitioner]'s [trial counsel]'s failure to object to or
> raise this claim resulted in prejudice.

(Docket Entry 1 at 197-202 (internal parenthetical citations and stray commas omitted) (emphasis added).)

The trial court did not discuss its reasons for denying Petitioner's parallel subclaim in his Amended MAR in denying the entirety of Petitioner's ineffective assistance claim (see Docket Entry 6-26 at 4-11), but the Court nonetheless should treat the trial court's summary denial as a ruling on the merits for purposes of Section 2254(d) deference, see Harrington, 562 U.S. at 98-100. Through the lens of double deference under Section 2254(d) and Strickland, Petitioner's third ineffective assistance subclaim falls far short of showing the trial court contradicted/misapplied clearly established federal law or misapplied the facts in light of the evidence.

Most significantly, the trial court addressed the constitutionality of the officers' extension of the checkpoint stop after detecting the odor of marijuana in Petitioner's vehicle in its order denying Petitioner's motion to suppress. (See Docket Entry 6-4.) In particular, the trial court found as a fact that one of the officers "came to the driver's door [of Petitioner's vehicle], interacted with [him], and smelled the odor of marijuana"

47

(id. at 5), as well as concluded "[t]hat the on-site supervisor developed reasonable articulable suspicion of criminal activity afoot to stop and investigate [Petitioner] based upon his detection of the odor of marijuana emanating from [Petitioner]'s vehicle at the checkpoint" (id. at 7), and "[t]hat[,] based upon the totality of the circumstances, there was no violation of [Petitioner]'s rights under the United States Constitution" (id. at 8). The constitutionality of the checkpoint stop constituted a question of law that, as shown above, the trial court resolved prior to trial. As that matter remained outside the province of the jury, Petitioner has failed to show that any issue regarding the constitutionality of the officers' extension of the checkpoint stop afforded a valid basis on which his trial counsel should have objected to trial testimony.

Furthermore, Petitioner does not deny that his vehicle smelled of marijuana (much less deny that it contained marijuana) (see Docket Entry 1 at 197-202), and he concedes that the belt microphone captured one of the officers at the window of Petitioner's driver-side door "asking about marijuana" (id. at 201). Moreover, Petitioner admits that the officers' smelling marijuana in Petitioner's vehicle would give the officers "probable cause" to continue their investigation. (Id. at 200.) In light of those admissions, even if the alleged absence of an audible conversation on the belt microphone recording between the officers

48

regarding the marijuana smell would have had some conceivable effect on the _weight_ the jury would accord the officers' testimony, that fact would not have rendered the officers' testimony _inadmissible_. See McGee v. Warden of Lieber Corr. Inst., No. 5:21CV2777, 2022 WL 5434349, at *26 (D.S.C. July 15, 2022) (unpublished) (rejecting ineffective assistance claim based on trial counsel's failure to object to eyewitness's testimony on grounds that she failed to identify the defendant in line-up, because "th[at] fact went to the _weight or credibility_ of her testimony and description of the assailant not to the _admissibility_ of her testimony" (emphasis added)), recommendation adopted, 2022 WL 4591875 (D.S.C. Sept. 30, 2022) (unpublished), appeal dismissed, No. 22-7148, 2023 WL 2204427 (4th Cir. Feb. 24, 2023) (unpublished). Accordingly, any objection by trial counsel to the officers' extension of the stop based on the smell of marijuana (beyond an objection merely to preserve the matter for appeal, which issue this Recommendation already has addressed in connection with the first ineffectiveness subclaim) would have failed, and, therefore, Petitioner has not shown deficient performance by trial counsel for failing to make such a futile objection. See Oken, 220 F.3d at 269 ("[T]rial Counsel [i]s not constitutionally ineffective in failing to object . . . [when] it would have been futile for counsel to have done so . . . .").

49

Petitioner's fourth subclaim of ineffective assistance contends that trial counsel "failed to object to and impeach [a] state's witness due to her inability to tell the truth while testifying against her written and sworn statements." (Docket Entry 1 at 26; see also Docket Entry 9 at 19.) Once again, Petitioner's materials in this Court do not further explain this contention; however, the Court could consider the following factual assertions and legal arguments Petitioner included in his Amended MAR's parallel subclaim:

> At trial[,] the State relied solely on the testimony of [a passenger in Petitioner's vehicle] to establish that [he] possessed the firearm in question. But [the passenger's] numerous inconsistencies of the details and events that transpired that morning[] proves that she was discreditable and not truthful as a witness. Under . . . Rule 601(b)(2)[ of the North Carolina Rules of Evidence], a witness is disqualified to testify if they [sic] are incapable of telling the truth. [The passenger]'s numerous inconsistencies and fabrications, plus her attitude towards [Petitioner's trial] counsel when questioned, should weigh heavily on th[e trial c]ourt. [The passenger] testified incriminating [Petitioner] by saying [he] had said, "Man, I had to, I had to [']cause, you know, I had a gun." But when questioned on [c]ross about [the passenger's] signed statement taken that morning of 20 February 2016, [she] then testifies that [Petitioner] said, "I got to do it, I got to do it, I got a gun." That morning in question, there were two written statements given to [an o]fficer of the Lexington Police Department. One statement was from [the passenger, who sat in the back seat], and the second statement was from the front seat passenger []. In neither of th[o]se two statements were [sic] there ever a mention of a gun. Even in [the officer]'s Case Supplemental Report, [the officer] mentioned [the back seat passenger] saying, "she was unsure if [Petitioner] grabbed anything or threw anything out [the vehicle's window,] because she was sitting behind [Petitioner]."

50

By not objecting to and impeaching [the back seat passenger] due to her fraudulant [sic] testimony, [trial counsel] was ineffective. Since there is a chance the outcome of [Petitioner]'s case would have been different, [his trial counsel]'s failure to object to or raise this claim resulted in prejudice. . . .

[Petitioner] contends that allowing [the back seat passenger] to testify against her signed statement taken the morning of the incident, lead [sic] the [trial c]ourt and the jury to believe that [Petitioner] possessed the gun in question. See United States v. Orr, 636 F.3d 944, 951-52 (8th Cir. 2011) (failure to impeach witness constitutes ineffective assistance when there is a reasonable probability that, absent counsel's failure, jury would have had reasonable doubt of [the] defendant's guilt); see[ also] Gonzales-Soberal v. United States, 244 F.3d 273 (1st Cir. 2001) (failure to use documentary evidence to impeach government witness[es] stated claim of ineffective assistance where no other evidence, other than witnesses' testimony tied [the] defendant to drug transactions, and documentary evidence showed one witness had psychological inability to distinguish between truth and fiction); United States v. Tucker, 716 F.2d 576, [5]85-87 (9th Cir. 1983) (counsel's failure to impeach witness with prior inconsistent statements was ineffective assistance); [] United States v. Butler, 504 F.2d 220, 224 (D.C. Cir. 1974) (failure to impeach witness with inconsistent pre-trial testimony was ineffective assistance); [] Moore v. Marr, 254 F.3d 1235, 1241 (10th Cir. 2001) ("[C]ounsel's failure to impeach a key prosecution witness is potentially the kind of representation that falls outside the wide range of professionally competent assistance[. . . .]" [(internal quotation marks omitted)])[.]

(Docket Entry 1 at 202-07 (internal parenthetical citations omitted) (underscoring in case citations added) (citing Docket Entry 1 at 233-34 (Case Supplemental Report), 237-38 (statement of back seat passenger), 239-40 (statement of front seat passenger)).)

Although the trial court did not discuss its reasoning for denying Petitioner's parallel subclaim in his Amended MAR when it

51

denied his entire ineffective assistance claim (see Docket Entry 6-26 at 4-11), the Court nevertheless should treat the trial court's summary denial as a merits ruling under Section 2254(d), see Harrington, 562 U.S. at 98-100. Under the double deference of Section 2254(d) and Strickland, Petitioner's fourth ineffective assistance subclaim provides no basis for relief.

Most significantly, this subclaim fails as conclusory and unsupported. See Nickerson v. Lee, 971 F.2d 1125, 1136 (4th Cir. 1992) (holding that, "[i]n order to obtain an evidentiary hearing . . . a habeas petitioner must come forward with some evidence that the claim might have merit," and that "[u]nsupported, conclusory allegations do not entitle a habeas petition to an evidentiary hearing"), abrogated on other grounds, Gray v. Netherland, 518 U.S. 152, 165-66 (1996). Petitioner has failed to point to any portions of the trial transcript that would show whether (and how effectively) his trial counsel 1) objected to certain aspects of the back seat passenger's testimony on direct examination, and 2) impeached that witness's testimony on cross-examination. (See Docket Entries 1, 9.) Such "[v]ague and conclusory allegations . . . may be disposed of without further investigation by the [] Court." United States v. Dyess, 730 F.3d 354, 359 (4th Cir. 2013); see also United States v. Basham, 789 F.3d 358, 375 (4th Cir. 2015) ("[T]o succeed on his ineffective assistance claims, [the petitioner] is not entitled to satisfy the prejudice requirement

though rank speculation . . . ." (internal quotation marks omitted)).

Even assuming that Petitioner's trial counsel did not cross-examine the back seat passenger on the differences between her testimony on direct and cross-examination regarding Petitioner's statements after the officers stopped his vehicle, Petitioner still has not shown that the trial court contradicted and/or misapplied Strickland in denying Petitioner's parallel Amended MAR subclaim. Petitioner has entirely failed to explain the relevance of the trivial and semantic difference between the back seat passenger's alleged testimony on direct examination that Petitioner stated, "'Man, I had to, I had to [']cause, you know, I had a gun,'" and testimony on cross-examination "that [Petitioner] said, 'I got to do it, I got to do it, I got a gun'" (Docket Entry 1 at 203-04), particularly where both statements included the critical portion of Petitioner's remark that he possessed "'a gun'" (id.). In fact, had trial counsel questioned that witness about those differences, counsel would have risked highlighting for the jury the witness's report of hearing Petitioner say he possessed a gun.

"[T]rial counsel is not deficient for failing to cross-examine a witness about an issue that counsel does not want to emphasize." Bowman v. Stirling, No. 9:18CV287, 2019 WL 8918815, at *23 (D.S.C. Dec. 10, 2019) (unpublished), recommendation adopted, 2020 WL 1466005 (D.S.C. Mar. 26, 2020) (unpublished), aff'd, 45 F.4th 740

53

(4th Cir. 2022); see also Higgs v. United States, 711 F. Supp. 2d
479, 515 (D. Md. 2010) ("[C]ounsel constantly must decide what
questions to ask and how much time to spend on a particular
witness. These are precisely the types of tactical decisions a
court is not supposed to second guess."), aff'd, 663 F.3d 726 (4th
Cir. 2011); Jones v. United States, Nos. 5:04CR324, 5:08CV582, 2010
WL 2612310, at *3 (E.D.N.C. June 25, 2010) (unpublished) ("[T]he
fact that [the petitioner's trial] counsel failed to address a
minor discrepancy between [a government witness's] testimony and
handwritten notes made by an officer . . . was not ineffective
assistance."), appeal dismissed, 416 F. App'x 318 (4th Cir. 2011);
Campbell v. United States, 364 F.3d 727, 735 (6th Cir. 2004)
(affirming rejection of inadequate impeachment claim where
"inconsistencies identified by [the] defendant were relatively
minor").

Petitioner's assertion that his trial counsel performed
deficiently by not cross-examining the back seat passenger
regarding the variance between her testimony and her written
statement to police (see Docket Entry 1 at 203-04) fares no better.
Even in the absence of the trial transcript, the existing record
before the Court belies Petitioner's contention that his trial
counsel "allow[ed the back seat passenger] to testify against her
signed statement taken the morning of the incident" (id. at 205-
06). Petitioner admitted that the back seat passenger displayed an

54

"attitude towards [Petitioner's trial] counsel <u>when questioned</u> (<u>id.</u> at 203 (emphasis added)), and the transcript of the trial court's hearing on Petitioner' motion to dismiss the firearm charge revealed the following remarks by Petitioner's trial counsel:

> Then you have [the back seat passenger's] testimony. I'm not quite sure what to make of that except to "Ask your next question," she says to me. I would say, Your Honor, she's unbelievable. <u>She admitted to having made two prior statements that were inconsistent with each other during the course of the investigation</u> and that her credibility is totally and wholly lacking.

(Docket Entry 6-6 at 6 (emphasis added).) In the face of that record evidence that Petitioner's trial counsel in fact elicited the back seat passenger's admission to making two prior inconsistent statements, Petitioner's wholly unsupported complaint that his trial counsel performed deficiently by "allowing [the back seat passenger] to testify against her signed statement" (Docket Entry 1 at 205-06) fails to show that the trial court contradicted and/or misapplied <u>Strickland</u> in denying Petitioner's parallel subclaim in his Amended MAR.

Petitioner also appears to fault his trial counsel for not "disqualif[ying]" the back seat passenger as a witness under Rule 601(b)(2) of the North Carolina Rules of Evidence, because Petitioner deemed that witness "incapable of telling the truth." (<u>Id.</u> at 203.) That Rule, however, did not provide trial counsel with a basis to move to disqualify the back seat passenger as a witness simply because inconsistencies existed between her various

55

statements.  Rather, Rule 601(b)(2) provides that "[a] person is disqualified to testify as a witness when the court determines that the person is . . . incapable of understanding <u>the duty of a witness to tell the truth</u>."  N.C. R. Evid. 601(b)(2) (emphasis added).  Petitioner has made no showing that the back seat passenger lacked the capacity to understand her duty to tell the truth while testifying at trial (<u>see</u> Docket Entries 1, 9) and, therefore, the trial court did not contradict or misapply <u>Strickland</u> in denying relief on this subclaim.[13]

Nor can Petitioner show that the trial court contravened/misapplied <u>Strickland</u> in ruling that Petitioner had failed to demonstrate prejudice arising out of his trial counsel's alleged deficient performance.  Although Petitioner contended that, "[a]t trial[,] the State relied <u>solely</u> on the testimony of [the back seat passenger] to establish that [Petitioner] possessed the firearm in question" (Docket Entry 1 at 202-03 (emphasis added)) and, thus, that his trial counsel's failure to "impeach [that passenger] due to her fraudulant [sic] testimony . . . resulted in prejudice" (<u>id.</u> at 205; <u>see also</u> <u>id.</u> (contending that, absent trial

---

[13]  Notably, the trial court arrived at the same conclusion in denying Petitioner's separate claim in his Amended MAR alleging that the trial court erred in denying Petitioner's motion to dismiss the firearm charge:

> [Petitioner] also argued that [the back seat passenger] was "discreditable and unreliable." Yet, this argument failed to attack the witness's <u>competency</u>, raising only credibility concerns which are left for the jury to evaluate. *See e.g., Crocker v. Roethling*, 363 N.C. 140, 156, 675 S.E.2d 625, 636 (2009).

(Docket Entry 6-22 at 5 (emphasis added).)

counsel's deficient performance, "there is a <u>chance</u> the outcome of [Petitioner]'s case would have been different" (emphasis added)), the record before the Court does not support that assertion. The North Carolina Court of Appeals noted the following trial evidence supporting Petitioner's possession of the firearm in question:

> During the chase, [Petitioner] swerved into the oncoming lane, then back into the right lane. Officers pursued [Petitioner], stopped his vehicle, and arrested him. . . . [A]n officer retracing the path of pursuit discovered a Glock 21 handgun, clip, and holster in the area where [Petitioner] had swerved into the oncoming lane.

<u>Ellis</u>, 2020 WL 6140639, at *1. Similarly, the transcript of the trial court's hearing on Petitioner's motion to dismiss the firearm charge due to insufficiency of the evidence reveals that the State introduced "video and photographs about where the gun was located on the left-hand side of the road along the route that the [officers'] pursuit [of Petitioner] took," and that one of the pursuing officers testified that he observed Petitioner's vehicle "veering over the double yellow line into the left lane" during the pursuit. (Docket Entry 6-6 at 6.) In light of the substantial evidence tying Petitioner to the firearm in question, Petitioner has not shown a reasonable probability that further cross-examination of the back seat passenger by trial counsel would have resulted in the trial court granting Petitioner's motion to dismiss the firearm charge.

57

Lastly, Petitioner's fifth ineffective assistance subclaim argues that his trial counsel "fail[ed] to investigate evidence and fail[ed] to object to the admission of erroneous video footage." (Docket Entry 1 at 26; see also Docket Entry 9 at 19.) As Petitioner did with his other ineffective assistance subclaims, he has failed to provide the Court with any additional details regarding these assertions. The Court, however, may choose to consider Petitioner's corresponding factual and legal contentions in his Amended MAR:

> At trial[,] the State used two videos as evidence allegedly taken from [two officers]' in-car cameras. These vital pieces of evidence were used for the State to establish an operational checkpoint, as well as the events that transpired at this alleged checkpoint on the morning of 20 February 2016. Not only do these videos show multiple inconsistencies to both officers [sic] testimonies[ b]ut, most importantly, there are [d]iscovery [e]rrors related to these videos as well.

> As the [trial c]ourt will see on page 1 of the State's [d]iscovery, [an o]fficer [] first initialled [sic] stating that there were no other materials known to exist at the time of turning in the [d]iscovery. Going back, [that o]fficer [] crossed out those initials while initialing the second column [sic] of the form, stating that there was a [DVD] in-car and it was located at "Evidence of [sic] Lexington P.D." Upon initialing the second column [sic], [that o]fficer [] failed to give reason of why he didn't copy the video. On page 3 of the State's [d]iscovery [entitled] Defendant Identification Information, under [the] subsection "Statements Made by This Defendant," the last column [sic] [p]ertaining to tape (audio) and video recordings that was marked "yes" by [the o]fficer [], states: "Pursuant to N.C.G.S. 15A-903(a), if you have any video or audio taped footage in case, you 'must' provide a copy of tapes when you submit report!" After numerous attempts from [Petitioner] to obtain copies of this video, the first video was shown [sic] to [Petitioner] and his [trial]

58

counsel two years later after the incident at
[Petitioner]'s [s]uppression [h]earing, this was [one
o]fficer['s ] video. [The other officer]'s video was
shown three years later after the incident after
[Petitioner] received a copy at trial the day of 4 March
2019. These videos lead [sic] the [trial c]ourt[] and
jury to believe that this alleged checkpoint was
functional at [Petitioner]'s arrival at the stop sign on
Exit Ramp 29-70 at West 5th Avenue and, by not objecting
to these videos due to the [d]iscovery [e]rror and
inconsistencies, it prejudiced [Petitioner]. Since there
is a chance the outcome of [Petitioner]'s case would have
been different, [Petitioner's trial counsel]'s failure to
object or to raise this claim resulted in
prejudice. . . . <u>See</u> <u>Hart v. Gomez</u>, 174 F.3d 1067, 1070
(9th Cir. 1999) (a lawyer who fails adequately to
investigate, and to introduce into evidence, records that
demonstrate his client's factual innocence, or that
raises [sic] sufficient doubt as to that question to
undermine confidence in the verdict, renders deficient
performance); <u>English v. Romanowski</u>, 602 F.3d 714, 728
(6th Cir. 2010) (counsel was ineffective for failing to
conduct a sufficient pre-trial investigation).

(Docket Entry 1 at 208-12 (internal parenthetical citations
omitted) (standard punctuation applied).)

Although the trial court did not discuss its reasoning for
denying Petitioner's parallel ineffective assistance subclaim in
his Amended MAR, that court did offer the following conclusions of
law in its merits-based ruling on Petitioner's separate claim in
his Amended MAR faulting the state for introducing the video
footage at trial:

[Petitioner] first complained of the State's delay in
providing body camera and vehicle dash camera footage,
waiting until the motion to suppress and the day of
trial. However, "due process . . . [is] satisfied by the
disclosure of the evidence at trial, so long as
disclosure is made in time for the defendants to make
effective use of the evidence." *State v. Small*, 131 N.C.
App. 488, 490, 508 S.E.2d 799, 801 (1998) (citation

59

omitted). Here, due process was satisfied because, by [Petitioner]'s own admission, he received the video footage before trial. Furthermore, [trial] counsel effectively cross examined the law enforcement officers who were present at the scene.

[Petitioner] next argued that there were inconsistencies between the videos and the law enforcement officers' trial testimony for the State . . . . However, . . . the officer-witnesses in question both testified to the authenticity of their respective videos, and the jury was free to assess any inconsistencies between the videos and their testimony.

(Docket Entry 6-22 at 5.) That reasoning provides a valid rationale for the trial court's summary denial of Petitioner's ineffective assistance subclaim in his Amended MAR premised on his trial counsel's failure to object to the video footage, and makes clear that the trial court did not contravene or misapply Strickland in denying that subclaim.[14]

In sum, the Court should deny Ground Eight as meritless.

_____

[14] Additionally, Petitioner's contention that "inconsistencies" existed between the video footage and the officers' testimony (Docket Entry 1 at 208) fails as conclusory and unsupported. See Nickerson, 971 F.2d at 1136 (holding that, "[i]n order to obtain an evidentiary hearing . . . a habeas petitioner must come forward with some evidence that the claim might have merit," and that "[u]nsupported, conclusory allegations do not entitle a habeas petition to an evidentiary hearing"). Petitioner has not identified a single inconsistency between the video footage and the officers' testimony, let alone (A) established any viable basis for an objection to the admissibility of that testimony even if inconsistencies existed, or (B) shown prejudice. (See Docket Entries 1, 9.) Such "[v]ague and conclusory allegations . . . may be disposed of without further investigation by the [] Court." Dyess, 730 F.3d at 359; see also Basham, 789 F.3d at 375 ("[T]o succeed on his ineffective assistance claims, [the petitioner] is not entitled to satisfy the prejudice requirement though rank speculation . . . ." (internal quotation marks omitted)).

## IV. <u>Conclusion</u>

The Petition fails to provide a basis for collateral relief.

**IT IS THEREFORE RECOMMENDED** that Respondent's Motion for Summary Judgment (Docket Entry 5) be granted, that the Petition (Docket Entry 1) be denied, and that a judgment be entered dismissing this action, without issuance of a certificate of appealability.


                                          /s/ L. Patrick Auld
                                                   **L. Patrick Auld**
                                   **United States Magistrate Judge**

January 13, 2025